**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 25-2027**

─────────

TITLEMAX OF SOUTH CAROLINA, INC.,

Plaintiff - Appellant,

v.

WENDY SPICHER, in Her Official Capacity as Secretary of the Pennsylvania Department of Banking and Securities,

Defendant - Appellee.

------------------------------

STATE OF SOUTH CAROLINA

Amicus Supporting Appellant

─────────

Appeal from the United States District Court for the District of South Carolina, at Florence. Joseph Dawson, III, District Judge.  (4:24-cv-04399-JD)

─────────

Argued: March 18, 2026                    Decided:  August 5, 2026

─────────

Before THACKER, RUSHING, and BENJAMIN, Circuit Judges.

─────────

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Benjamin wrote the opinion, in which Judge Thacker and Judge Rushing joined.

─────────

**ARGUED:** Troy Clifton Homesley, III, TROUTMAN PEPPER LOCKE LLP, Charlotte, North Carolina, for Appellant. A. Michael Pratt, GREENBERG TRAURIG, P.A., Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Ryan J. Strasser, Richmond, Virginia, Christopher G. Browning, Raleigh, North Carolina, Misha Tseytlin, TROUTMAN PEPPER LOCKE LLP, Chicago, Illinois, for Appellant. Brian T. Feeney, Philadelphia, Pennsylvania, Dominic E. Draye, GREENBERG TRAURIG, LLP, Washington, D.C., for Appellee. Thomas T. Hydrick, Solicitor General, Joseph D. Spate, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus Curiae.

2

DEANDREA GIST BENJAMIN, Circuit Judge:

This appeal addresses when a federal court may intervene in state civil enforcement proceedings.

TitleMax of South Carolina, Inc. ("TitleMax SC") originates all of its loans in South Carolina, but the Pennsylvania Department of Banking and Securities (the "Department") contends that some of those loans involved Pennsylvania borrowers and violated Pennsylvania usury laws. Based on TitleMax SC's conduct in Pennsylvania, the Department issued an investigative subpoena in 2017, seeking records related to loans involving Pennsylvania consumers. After litigation over that subpoena, the Department initiated a formal administrative enforcement proceeding against TitleMax SC for alleged violations of Pennsylvania's usury laws. The Department separately issued a second investigative subpoena in 2024.

TitleMax SC responded with this federal suit, seeking to halt both the administrative enforcement proceeding and the second investigative subpoena. TitleMax SC alleges a Dormant Commerce Clause claim, arguing that the Department may not apply Pennsylvania's usury laws to loans originated in South Carolina because doing so would regulate commerce occurring wholly outside Pennsylvania. The district court dismissed the complaint, concluding that TitleMax SC's claims related to the enforcement proceedings were barred by issue preclusion or, in the alternative, *Younger* abstention. The district court also held that TitleMax SC's claims related to the second investigative subpoena were not ripe.

3

We affirm on the *Younger* and ripeness grounds. First, we hold that TitleMax SC's claims challenging the administrative enforcement proceeding interfere with an ongoing state proceeding, triggering the court's duty to abstain under *Younger*. Second, we hold the claims challenging the second investigative subpoena are not ripe because TitleMax SC has not alleged a present injury from the second investigative subpoena itself.

## I. Background

### A. TitleMax of South Carolina and Its Affiliated Companies

TitleMax SC is a South Carolina corporation with its principal place of business in Savannah, Georgia. It is licensed under South Carolina law to offer consumer loans secured by motor vehicle titles[1], and it maintains physical locations in South Carolina. In addition to title secured loans, TitleMax SC also offers unsecured personal loans both online and in-store.

Although TitleMax SC offers unsecured loans online[2], TitleMax SC originates loans exclusively within the territorial and geographic borders of South Carolina. TitleMax SC only offers title secured loans in person at TitleMax SC's stores, all of which are in South Carolina. To obtain an unsecured online loan, the borrower must have GPS location services turned on, allowing TitleMax SC to determine that the borrower is in South

---

[1] Title secured loans (or auto title loans) are loans where a borrower uses their lien-free vehicle as collateral for receiving the loan.

[2] Unsecured loans do not require the borrower to provide collateral and are issued and approved by the lender based solely on the borrower's credit history, income, and present debt.

4

Carolina before processing the loan.  Thus, a borrower located outside of South Carolina must travel into South Carolina to obtain a loan from TitleMax SC.

Even with these geographic requirements, TitleMax SC has made some loans to non-South Carolina residents, including Pennsylvania residents who traveled to South Carolina.  TitleMax SC's internal corporate records show it made approximately 120 loans to individuals who had a Pennsylvania address between 2008 and the present.  TitleMax SC maintains that it does not originate loans, keep offices, employ personnel, or disburse loan proceeds in Pennsylvania, and that any borrower must appear in person at a South Carolina store to obtain a title secured loan.  TitleMax SC has, however, engaged in conduct connected to Pennsylvania borrowers or collateral, including perfecting or recording liens with the Pennsylvania Department of Transportation, collecting payments from Pennsylvania residents, communicating with borrowers in Pennsylvania, and repossessing vehicles located in Pennsylvania.

TitleMax SC is part of a broader family of affiliated entities (collectively, "TitleMax"[3]).

---

[3] TMX Finance LLC is the parent company of TitleMax SC and other entities that offer motor vehicle title secured loans, including, but not limited to, TitleMax of Ohio, Inc., TitleMax of Delaware, Inc., and TitleMax of Virginia, Inc.

For convenience, the court refers collectively to TitleMax SC and the affiliated TitleMax companies as "TitleMax."  This definition is only used as descriptive shorthand and does not resolve any disputed question concerning corporate separateness, privity, control, adequate representation, alter-ego status, or whether TitleMax SC may be bound by a ruling entered against any other TitleMax affiliated company.

5

## B. Pennsylvania Usury Laws and State Administrative Process

Pennsylvania regulates consumer lending through two statutes relevant here: the Loan Interest and Protection Law ("LIPL") and the Consumer Discount Company Act ("CDCA"). LIPL, 41 PA. CONS. STAT. §§ 101–605; CDCA, 7 PA. CONS. STAT. §§ 6201–6221. The LIPL establishes Pennsylvania's general usury rule by capping interest at 6% per year for loans less than $50,000. LIPL, 41 PA. CONS. STAT. § 201(a). The CDCA functions as the licensing statute for lenders seeking to charge more than the lawful rate. CDCA, 7 PA. CONS. STAT. §§ 6203(A), 6213. The CDCA expressly prohibits engaging "in the business of negotiating or making loans or advances of money or credit" at higher rates without first obtaining a license. CDCA, 7 PA. CONS. STAT. § 6203(A). The CDCA still caps the interest that licensed lenders can charge at 24% per year for loans of $25,000 or less. *Id.* §§ 6203(A), 6213. Violations of these acts may carry both criminal and civil penalties. LIPL, 41 PA. CONS. STAT. § 505; CDCA, 7 PA. CONS. STAT. § 6218.

Pennsylvania's Department of Banking and Securities (the "Department") is the state agency charged with administering and enforcing these laws. LIPL, 41 PA. CONS. STAT. § 506(b), (c); CDCA, 7 PA. CONS. STAT. § 6212. Within the Department's enforcement structure, the compliance office brings the charges, while the Pennsylvania Banking and Securities Commission (the "Commission") is the agency head and final adjudicator for the administrative proceeding. 71 PA. CONS. STAT. §§ 733-1121-A, 733-1122-A(1).

The Department's enforcement process typically begins with an investigation. Under the CDCA, the Department may examine the business of licensees and may exercise

6

authority over those engaged in the business regulated by the Act.  *Id.* §§ 6211–12.  Under the LIPL, the Department may examine instruments, documents, accounts, books, records, electronic data, and files, and may conduct investigations necessary to administer the statute.  LIPL, 41 PA. CONS. STAT. § 506(b).  The Department may also issue subpoenas requiring testimony or production of records and may seek court assistance if a subpoenaed person refuses to comply.  CDCA, 7 PA. CONS. STAT. § 6212; LIPL, 41 PA. CONS. STAT. § 506(b).

If the Department elects to pursue administrative enforcement for alleged LIPL or CDCA violations, the compliance office may initiate a formal enforcement action by issuing an order to show cause ("OSC") stating the grounds for the action and requiring the respondent to answer.  1 PA. CODE § 35.14.  The respondent's answer must admit or deny the charges, state facts on which the respondent relies, and identify the legal grounds for its position.  *Id.* § 35.37.  After the OSC and answer, the matter proceeds to a hearing before the Commission or a hearing examiner designated by the Commission.  *Id.* §§ 35.123, 35.185, 35.187.

A designated hearing examiner may conduct a hearing and then issue a proposed report or recommended decision for the Commission.  *Id.* §§ 35.121, 35.187, 35.202.  During the hearing, the hearing examiner may receive evidence and address procedural matters but may not dispose of motions that determine the proceeding before issuing a proposed report.  *Id.* § 35.187.  Once the hearing examiner has issued a proposed report, a party may file objections with the Commission.  *Id.* § 35.211, 35.213.  The Commission,

7

as agency head, will then take final administrative action and issue a final order adjudicating the proposed report and the filed exceptions. *Id.* § 35.226.

Once the Commission issues a final adjudication, a party may seek judicial review in the Pennsylvania Commonwealth Court. 2 PA. CONS. STAT. § 702; 42 PA. CONS. STAT. § 763(a)(1).

Interlocutory review from a hearing examiner's decision or from an interim Commission order is more limited. A participant generally may not appeal a hearing examiner's ruling "except in extraordinary circumstances where prompt decision by the Commission is necessary to prevent detriment to the public interest." 1 PA. CODE § 35.190(a). A participant may seek interlocutory certification of a non-final order from the Commission, but that request does not automatically stay the administrative proceeding. *Id.* § 35.225.

### C. The Department's 2017 Subpoena

The Department's investigation of TitleMax began in August 2017, when the Department issued an investigative subpoena concerning possible violations of Pennsylvania's usury laws. *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 235 (3d Cir. 2022); J.A. 025.[4] The 2017 subpoena sought documents concerning loans made by TitleMax[5] to Pennsylvania consumers. *Weissmann*, 24 F.4th at 235. The requested

---

[4] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers refer to the "J.A. #" pagination.

[5] The 2017 subpoena was addressed to "TitleMax, TMX Finance | Family of Companies." J.A. 143.

8

documents included: "loan agreements between TitleMax and Pennsylvania consumers, information presented to Pennsylvania consumers through the mail or internet, solicitations or offerings circulated or aired in Pennsylvania, records of TitleMax employees who traveled to Pennsylvania, lists of vehicles repossessed in Pennsylvania, Pennsylvania consumer complaints, invoices or bills sent to Pennsylvania consumers, and any electronic transfers of funds from Pennsylvania consumer bank accounts." *Id.*

After receiving the 2017 subpoena, TitleMax did not comply and instead filed suit in the United States District Court for the District of Delaware. *TitleMax of Del., Inc. v. Weissmann*, 505 F. Supp. 3d 353, 354–55 (D. Del. 2020). In that action, TitleMax sought to enjoin the Department's investigation, arguing, among other things, that the Department's investigative subpoena attempted to apply Pennsylvania's usury laws extraterritorially in violation of the Dormant Commerce Clause. *Id.*

The Department separately filed a petition in Pennsylvania Commonwealth Court to enforce the subpoena. *Weissmann*, 24 F.4th at 235.

In the Delaware federal action, the parties conducted discovery and filed cross-motions for summary judgment. *Id.* The district court granted summary judgment for TitleMax, finding the Department's subpoena violated the Dormant Commerce Clause because the loans were made and executed outside Pennsylvania at physical TitleMax locations in Delaware, Ohio, or Virginia. *Weissmann*, 505 F. Supp. 3d at 360.

The Department appealed to the Third Circuit, which reversed and held that applying the CDCA and LIPL to TitleMax's conduct did not violate the Dormant Commerce Clause. *Weissmann*, 24 F.4th at 235–36.

9

The court began with Dormant Commerce Clause principles and its analytical framework. *Id.* at 238. Dormant Commerce Clause analysis concerns the state law's effect on interstate commerce. *Id.* (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). One way a law may affect interstate commerce is by having extraterritorial impact on another state's economic activity. *Id.* (quoting *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261–62 (3d Cir. 2006)). But not every extraterritorial effect violates the Dormant Commerce Clause. *See id.* at 238 n.7. A law violates the Dormant Commerce Clause on extraterritoriality grounds when it directly controls commerce occurring "wholly outside" the State's borders. *Id.* (citing *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). If it does not have that prohibited extraterritorial reach and does not discriminate against out-of-state actors, the law is evaluated under the *Pike* balancing test and will be upheld unless the burden on interstate commerce is clearly excessive in relation to the putative local benefits. *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Applying that framework, the Third Circuit proceeded in two steps. First, the court described TitleMax's lending activity as extending beyond loan origination in the relevant States (Delaware, Ohio, and Virginia) and into Pennsylvania. *Id.* at 234–35. Although TitleMax did not have offices, employees, agents, or physical stores in Pennsylvania, the court noted that TitleMax recorded liens with Pennsylvania state authorities, collected payments from Pennsylvanians, communicated with Pennsylvania borrowers, and repossessed vehicles in Pennsylvania. *Id.* The court held that TitleMax's conduct was not "wholly outside of Pennsylvania" because TitleMax received payments from within

10

Pennsylvania and maintained security interests in vehicles located in Pennsylvania. *Id.* at 239–40.

Second, having concluded that TitleMax's conduct did not occur wholly outside Pennsylvania, the court applied *Pike* balancing. *Id.* at 240–41. On the burden side, the court noted that applying Pennsylvania's usury laws to transactions with Pennsylvanians placed TitleMax in "no different position than an in-state lender." *Id.* at 240. On the benefit side, the court noted that Pennsylvania had "a strong interest in prohibiting usury." *Id.* at 241. The court ultimately concluded that applying Pennsylvania's usury laws to TitleMax furthered Pennsylvania's interest in prohibiting usury and that "any burden on interstate commerce from doing so [was], at most, incidental." *Id.* Pennsylvania could therefore "investigate and apply its usury laws to TitleMax without violating the Commerce Clause." *Id.* Accordingly, the Third Circuit reversed and directed the district court to enter judgment for the Department. *Id.*

After the Third Circuit's ruling, the Commonwealth Court granted the Department's petition to enforce the 2017 subpoena, ordering TitleMax to produce all responsive documents. TitleMax complied.

### D. The Department's 2024 Subpoena

In 2024, the Department issued another investigative subpoena to TitleMax[6] seeking documents concerning loans and related activity involving Pennsylvania borrowers. The

---

[6] The 2024 subpoena defined "TitleMax" to include "TitleMax of Delaware, Inc., TitleMax of Ohio, Inc., TitleMax of Virginia, Inc., TitleMax of South Carolina, Inc., TitleMax Funding, Inc., TMX Finance LLC, TMX Finance Corporate Services, Inc., CCFI (Continued)

11

subpoena invoked the Department's investigative authority under the CDCA and LIPL. The subpoena stated that the Department had information that TitleMax had made automobile title loans to borrowers with Pennsylvania addresses during the relevant period.

The subpoena requested information for the period beginning August 23, 2017, and continuing through the present. It sought loan or pawn documents between TitleMax and any Pennsylvania consumer, including loan agreements, promissory notes, pawn tickets, deferment agreements, Truth in Lending Act disclosures, and security agreements. It also sought electronic payment records relating to Pennsylvania consumers and records concerning repossessions of vehicles owned by Pennsylvania consumers.

### E. The Department's OSC and Enforcement Proceeding

Based on information retrieved from the 2017 subpoena, the Department's compliance office initiated a formal administrative enforcement proceeding by issuing an order to show cause (the "OSC Proceeding"). The OSC named multiple TitleMax entities, including TitleMax SC, as respondents and ordered TitleMax to show cause why the Commission should not impose sanctions and remedies based on alleged violations of the LIPL and CDCA. The OSC alleged that, from July 2008 through September 2017, TitleMax entered into at least 5,270 title secured loan agreements with Pennsylvania residents for loans of $50,000 or less at interest rates exceeding the LIPL's 6% cap. It alleged that those loan agreements carried interest rates as high as 720%.

---

Companies, LLC, and all successors or predecessors in interest, affiliates, subsidiaries, or parent companies of any of the foregoing." J.A. 062.

It further alleged that TitleMax conducted loan-servicing activities in Pennsylvania, including collecting payments, sending phone calls or text messages to borrowers residing in Pennsylvania, and repossessing vehicles in Pennsylvania after default. The OSC alleged that TitleMax was not, and had never been, licensed by the Department under the CDCA or otherwise. The OSC further alleged that TitleMax recorded liens with the Pennsylvania Department of Transportation on the vehicles associated with the title secured loans.

Based on those allegations, the OSC asserted 5,270 counts for violation of § 201(a) of the LIPL. The compliance office requested a civil penalty of $10,000 per offense under § 505(b) of the LIPL. It also requested restitution for actual damages to aggrieved Pennsylvania residents under § 506(c)(3) of the LIPL. Ultimately, the OSC proposed more than $52.7 million in civil penalties.

The notice accompanying the OSC advised TitleMax that they could challenge the OSC by filing a written answer and that failure to answer could waive their right to a hearing and allow the Commission to enter a final order against them. After an answer, TitleMax would be notified of the hearing examiner and, if a hearing were scheduled, the date, time, and place of the hearing.

After a hearing examiner was designated, TitleMax answered the OSC and moved to dismiss in the state agency proceedings. The motion to dismiss argued that the Department lacked personal jurisdiction over TitleMax. The hearing examiner issued a "Proposed Adjudication of Respondents' Motion to Dismiss," recommending denying the motion to dismiss and concluding that Pennsylvania had jurisdiction over TitleMax.

13

TitleMax then sought Commission review of the hearing examiner's proposed adjudication. First, TitleMax moved the hearing examiner to refer or certify the matter for Commission review. After the hearing examiner denied certification, TitleMax filed a direct appeal with the Commission. The Commission entered an order stating that the matter was not properly before it under 1 PA. CODE § 35.190, which, as stated above, allows interlocutory review in extraordinary circumstances where prompt decision by the Commission is necessary to prevent detriment to the public interest. The order further stated that the Commission would take no action at that time.[7]

After the Commission's order, the state proceeding continued to an evidentiary hearing. The hearing examiner held a three-day hearing at which the Department and TitleMax presented their respective cases. At the time of briefing in this case, the parties were engaged in post-hearing briefing, after which the hearing examiner was expected to issue a proposed adjudication for Commission review.

**F. TitleMax's Federal Challenges to the Department's Regulatory Activity**

After the Department commenced the state proceeding, TitleMax SC and other TitleMax entities filed six nearly identical complaints challenging the 2024 subpoena and the OSC. TitleMax filed those complaints in six different federal courts: the District of South Carolina, the Southern District of Ohio, the Western District of Virginia, the

---

[7] TitleMax sought review of the Commission's order in the Pennsylvania Commonwealth Court. [Opening Br. at 19–20.] The Department opposed that effort and took the position that the Commonwealth Court lacked appellate jurisdiction before final agency action. [*Id.*] At the time of appellate briefing and argument, that petition for review remained pending. [Response Br. at 29.]

14

Southern District of Georgia, the District of Delaware, and the Northern District of Texas. The complaints all raised similar constitutional challenges and sought to enjoin the state proceeding by alleging that the state proceeding violated the Dormant Commerce Clause, the Due Process Clause of the Fourteenth Amendment, the Full Faith and Credit Clause, and the Equal Protection Clause of the Fourteenth Amendment.

As relevant here, TitleMax's principal theory arises under the Dormant Commerce Clause, which limits the authority of states to enact legislation affecting interstate commerce. TitleMax principally argues that the Department is attempting to regulate commerce occurring wholly outside Pennsylvania by applying Pennsylvania's usury laws to loans originated in South Carolina. TitleMax also argues that applying Pennsylvania law would impermissibly burden interstate commerce.

The Department moved to dismiss each federal action on *Younger* abstention grounds and for lack of personal jurisdiction. *Younger* abstention is the doctrine under which federal courts may decline to interfere with certain ongoing state proceedings. *See Younger v. Harris*, 401 U.S. 37 (1971). The Department also sought to transfer the related actions to the Middle District of Pennsylvania. The Southern District of Georgia, Southern District of Ohio, District of Delaware, and Western District of Virginia transferred their respective actions to the Middle District of Pennsylvania.

The Northern District of Texas was the first federal court to dismiss one of the related actions. *TMX Fin. Corp. Servs., Inc. v. Spicher*, No. 24-cv-2054, 2024 WL 4995580, at *1 (N.D. Tex. Dec. 5, 2024). The Fifth Circuit affirmed that dismissal, holding

15

that *Younger* abstention was appropriate. *TMX Fin. Corp. Servs., Inc. v. Spicher*, No. 24-11087, 2026 WL 74504, at *1–3 (5th Cir. Jan. 9, 2026).

The Middle District of Pennsylvania also dismissed the transferred Georgia, Ohio, Virginia, and Delaware actions, citing *Younger* abstention. *TMX Fin. LLC v. Spicher*, 2025 WL 221798, at *1 (M.D. Pa. Jan 16, 2025). The Third Circuit affirmed the district court's dismissal under *Younger* abstention. *TitleMax of Va., Inc. v. Sec'y Pa. Dep't of Banking & Sec.*, No. 25-1137, 2026 WL 49584, at *1–5 (3d Cir. Jan. 7, 2026).

In this case, the Department moved to dismiss the complaint on three grounds. First, it argued that the district court should abstain under *Younger*. Second, it argued that the district court lacked personal jurisdiction over the Department. Third, after the Texas and Pennsylvania district courts dismissed the related actions, the Department argued that issue preclusion, a legal doctrine that prevents a party or its privy from relitigating an issue already decided in a prior proceeding, barred TitleMax SC from relitigating whether *Younger* abstention was appropriate.

The district court granted the Department's motion to dismiss. The district court declined to address the Department's personal jurisdiction argument because dismissal was required even assuming personal jurisdiction existed. It first dismissed TitleMax SC's claims challenging the 2024 subpoena as unripe. The district court reasoned that the 2024 subpoena was not self-executing, had not been enforced against TitleMax SC, and would require a future court order before enforcement. The district court then held that TitleMax SC's OSC-related claims were barred by issue preclusion because the Texas and Pennsylvania federal courts had already decided that *Younger* abstention applied to the

16

state proceeding.  In doing so, the district court found that TitleMax SC was in privity with other TitleMax affiliates for purposes of issue preclusion.  In the alternative, the district court found that *Younger* abstention independently required dismissal of the OSC-related claims.  Ultimately, the district court dismissed the entire complaint with prejudice and denied all pending motions as moot.

TitleMax SC now appeals the district court's order.  For the reasons explained below, we affirm the dismissal of TitleMax SC's claims challenging the OSC under *Younger* abstention and affirm the dismissal of TitleMax SC's claims challenging the 2024 subpoena on ripeness grounds.  Because those grounds fully resolve this appeal, we need not address the district court's alternative ruling that issue preclusion also barred TitleMax SC's OSC-related claims.

## II. *Younger* Abstention and the OSC Proceeding

We review the district court's ultimate decision to abstain for abuse of discretion, *New Beckley Mining Corp. v. International Union, United Mine Workers*, 946 F.2d 1072, 1074 (4th Cir. 1991), but we review de novo whether the basic requirements for abstention are satisfied, *VonRosenberg v. Lawrence*, 781 F.3d 731, 734 (4th Cir. 2015) (citing *Myles Lumber Co. v. CNA Fin. Corp.*, 233 F.3d 821, 823 (4th Cir. 2000)).

*Younger* abstention expresses "the 'national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances.' " *Robinson v. Thomas*, 885 F.3d 278, 285 (4th Cir. 2017) (quoting *Younger*, 401 U.S. at 41).  This "flavor of abstention is based on two deep-rooted concepts." *Erie Ins. Exch. v. Md. Ins.*

17

*Admin.*, 105 F.4th 145, 149 (4th Cir. 2024). The first is traditional equity practice, which establishes that "courts of equity should not act" to restrain another proceeding "when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44. The second and "even more vital consideration" is "the notion of 'comity,' " including the "belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44. This comity principle rests, in part, on the premise that " 'state courts are fully competent to decide issues of federal law.[]' " *Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 355 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 251 (4th Cir. 1993)).

But like all abstention doctrines, *Younger* abstention "is an exception to the general rule that federal courts must decide cases over which they have jurisdiction." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). A court therefore may abstain under *Younger* only after determining that the state proceeding satisfies the doctrine's two threshold requirements and that no exception permits federal intervention. *See Air Evac*, 37 F.4th at 95–96.

To determine whether *Younger* abstention applies, the court first must determine whether the ongoing state proceeding falls within one of "three exceptional" categories: (1) state criminal prosecutions, (2) quasi-criminal civil enforcement proceedings, and (3) civil proceedings involving certain orders uniquely in furtherance of the state court's ability to perform their judicial functions. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78–79 (2013). If the state proceeding falls within one of these three *Sprint* categories, courts must

18

then consider the "*additional* factors" identified in *Middlesex County. Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982), commonly known as the *Middlesex* factors. *Sprint*, 571 U.S. at 81. The three *Middlesex* factors ask (1) whether ongoing state proceedings are judicial in nature; (2) whether the state proceedings implicate important state interests; and (3) whether the state proceedings provide an adequate opportunity to raise the federal claims. *Middlesex*, 457 U.S. at 432 (1982). Finally, even when both the *Sprint* and *Middlesex* steps are satisfied, the court must determine whether one of *Younger*'s three exceptions to the court's duty to abstain applies: "(1) 'bad faith or harassment' by state officials responsible for the prosecution; (2) a statute that is 'flagrantly and patently violative of express constitutional prohibitions'; and (3) other 'extraordinary circumstances' or 'unusual situations.' " *Air Evac*, 37 F.4th at 96 (quoting *Younger* 401 U.S. at 49–54).

Our analysis here follows that sequence. We first ask whether the OSC Proceeding falls within one of the exceptional categories identified in *Sprint*. We next consider whether the *Middlesex* factors are satisfied. Finally, we address whether any exceptions to *Younger* permit federal intervention.

### A. *Sprint* Categories

The first and third *Sprint* categories do not accommodate the OSC Proceeding. The OSC Proceeding is civil, not criminal, and it did not touch on a state court's ability to perform its judicial function. *See Sprint*, 571 U.S. at 79–80. The OSC Proceeding therefore can only arguably fall under the second *Sprint* category, quasi-criminal civil enforcement proceedings.

19

A proceeding falls in this category if it is "akin to a criminal prosecution" in "important respects." *Id.* at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). Such proceedings "are characteristically initiated to sanction the federal plaintiff, *i.e.* the party challenging the state action, for some wrongful act." *Id.* The state actor involved in the proceeding is "routinely a party to the state proceeding and often initiates the action." *Id.* And "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Id.* at 79–80. In other words, a proceeding is quasi-criminal if (1) "the proceeding was initiated by the state in its sovereign capacity"; (2) "the proceeding sought to sanction the federal plaintiff for a violation of a legal right or duty"; and (3) "the proceeding has another striking similarity with a criminal prosecution, such as by beginning with a preliminary investigation that culminates with the filing of formal charges or by the state's ability to sanction the federal plaintiff's conduct through a criminal prosecution." *Borowski v. Kean Univ.*, 68 F.4th 844, 851 (3d Cir. 2023) (citing *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886, 891 (3d Cir. 2022)).

The OSC Proceeding satisfies those requirements. First, the Department initiated the OSC Proceeding in Pennsylvania's sovereign capacity. The OSC was issued by the Department's compliance office, and it invoked the Department's statutory authority to enforce Pennsylvania's lending laws. J.A. 048, 052, 055. Second, the OSC Proceeding seeks to sanction TitleMax SC for alleged violations of Pennsylvania law. The OSC seeks to determine whether TitleMax violated the LIPL and CDCA and whether the proposed sanctions and remedies should be imposed. J.A. 052. It alleges that TitleMax entered into thousands of loan agreements with Pennsylvania borrowers at interest rates exceeding the

interest rate caps. J.A. 054–55. And it requests a civil penalty of $10,000 per offense, as well as restitution for aggrieved Pennsylvania residents, for the alleged statutory violations. J.A. 055. Third, the OSC Proceeding followed an investigation and culminated in formal charges. The Department's 2017 subpoena was an investigative subpoena and was issued under statutory authority permitting the Department to investigate potential violations of the LIPL and CDCA. J.A. 142–43. After that investigation, the Department issued the OSC, which set forth 5,270 counts alleging violations of the LIPL and requested civil penalties and restitution. J.A. 054–55. That sequence—investigation, formal administrative charges, and requested sanctions—is the kind of quasi-criminal civil enforcement proceeding *Sprint* describes.

### B. *Middlesex* Factors

Now that we've determined that the OSC Proceeding falls into the second *Sprint* category, we must now determine whether the OSC Proceeding satisfies the *Middlesex* factors. To satisfy the *Middlesex* factors, the OSC Proceeding must (1) be ongoing and judicial; (2) implicate important state interests; and (3) provide an adequate opportunity to raise constitutional challenges. 457 U.S. at 432. We hold that the OSC Proceeding satisfies each factor.

### 1. Ongoing and Judicial

The first *Middlesex* factor asks whether the state proceeding is "ongoing" and "judicial in nature." *Id.* at 432–34. A state proceeding is ongoing for *Younger* purposes if it was pending before the federal action was filed. *See PDX N., Inc. v. Comm'r N.J. Dep't of Lab & Workforce Dev.*, 978 F.3d 871, 885 (3d Cir. 2020); *Baran v. Port of Beaumont*

21

*Nav. Dist.*, 57 F.3d 436, 441 (5th Cir. 1995). And a proceeding is judicial in nature when it "investigates, declares, and enforces liabilities" based on "present or past facts" and existing law. *Allstate Ins. Co. v. W. Va. State Bar*, 233 F.3d 813, 817 (4th Cir. 2000) (quoting *D.C. Ct. App. v. Feldman*, 460 U.S. 462, 477 (1983)). " '[P]roceedings may be judicial in nature if,' for example, judicial review is available, 'they are initiated by a complaint, adjudicative in nature, governed by court rules or rules of procedure, or employ legal burdens of proof.' " *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, 26 F.4th 571, 579 (3d Cir. 2022) (quoting *Kendall v. Russell*, 572 F.3d 126, 131 (3d Cir. 2009)). Administrative enforcement proceedings may satisfy this requirement where they are adjudicatory and subject to state court review. *See, e.g.*, *Air Evac*, 37 F.4th at 97; *Erie Ins. Exch.*, 105 F.4th at 147–49.

Here, the OSC Proceeding was ongoing because the Department issued the OSC before TitleMax SC filed this federal action. J.A. 048; J.A. 011. The OSC Proceeding is judicial in nature because it was initiated by a formal pleading, the OSC. J.A. 048–55. Additionally, TitleMax SC has a right to challenge the OSC's allegations. *Id.* Moreover, the OSC Proceeding is governed by a comprehensive set of rules and is subject to judicial review. *See* 1 PA. CODE §§ 31.1-35.251; 2 PA. CONS. STAT. § 702.

Thus, the first *Middlesex* factor is satisfied.

### 2. Important State Interest

The second *Middlesex* factor asks whether the state proceeding implicates important state interests. *Middlesex*, 457 U.S. at 432. The second factor reflects *Younger*'s concern with comity and respect for state functions. *See id.*; *Pennzoil Co. v. Texaco Inc.*, 481 U.S.

22

1, 11 (1987) (finding abstention proper "if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government"). It asks whether the state is using its own judicial or administrative processes to vindicate "important state interests." *See Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627 (1986) ("We have also applied [*Younger*] to state administrative proceedings in which important state interests are vindicated[.]"). State interests are important where the proceeding concerns matters that "implicate[] the sovereignty and dignity of a state" and fall within traditional areas of state authority. *Harper*, 396 F.3d at 354. Those interests include the State's administration of its courts, regulation of professions, protection of family and public welfare, control of land use and local affairs, and enforcement of laws governing conduct within the State. *Id.* The inquiry focuses on "the importance of the generic proceedings to the State," not the State's interest in prevailing in the particular case. *New Orleans Pub. Serv., Inc. (NOPSI) v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989).

Constitutional challenges to state actions may "call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action." *Id.* But "the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction." *Id.* That is because constitutional questions "generally can be resolved by state courts"; in fact, *Younger* rests on the premise that " 'state courts are fully competent to decide issues of federal law.[]' " *Harper*, 396 F.3d at 355 (quoting *Forst*, 4 F.3d at 251).

23

That principle has particular force when the federal constitutional claim itself does not implicate the allocation of authority among sovereigns. *See id.* In that setting, there is "no disrespect to federal-state relations" or comity in allowing state courts to decide the federal question. *Id.* Dormant Commerce Clause challenges, however, require closer attention because the Dormant Commerce Clause is concerned with the allocation of authority among sovereigns. *See id.* Specifically, the Dormant Commerce Clause seeks to protect the national market by limiting state laws that directly regulate, discriminate against, or unduly burden interstate commerce. *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 496–97 (4th Cir. 2025). A state proceeding that affects interstate commerce may affect other states and the national government in a way that ordinary constitutional challenges do not and therefore require special consideration under *Younger*. *See Harper*, 396 F.3d at 355.

In *Harper v. Public Service Commission*, the court declined to abstain under *Younger* because the West Virginia proceeding in that case "squarely implicate[d] the Commerce Clause." *Id.* at 357. West Virginia required an Ohio waste hauler to obtain a certificate of convenience and necessity before serving West Virginia customers. *Id.* at 350. The certificate could not issue unless existing haulers were not already "adequately serving the same territory." *Id.* (quoting W. Va. Code Ann. § 24A-2-5(a) (2004)). The challenged system therefore protected incumbent providers from competition and restricted market entry by out-of-state haulers. *Id.* at 350–51. The court rejected West Virginia's broad characterization of its interest as protecting health and welfare, stating that the challenged requirement did not concern the "improper disposal of solid waste." *Id.*

24

at 355. To the court, the challenged requirement concerned who has the right to contract with West Virginia customers to remove waste, and therefore, the actual state interest was "limiting interstate access to the waste removal market." *Id.*

That characterization changed the *Younger* analysis. "Because the interest advanced [by West Virginia was] one that *by its very nature* serve[d] to impede interstate commerce," the court found it necessary to "evaluate the effect of the [D]ormant Commerce Clause upon the decision to abstain." *Id*. The court explained that "[t]he commerce power plays a role in abstention analysis quite different from many of the other provisions of the Constitution" because the Dormant Commerce Clause "implicates interstate interests" and protects the national market from state-imposed barriers to trade. *Id.* The court found the interest in preventing the states from "balkanizing into separate economic units" as "a peculiarly national interest." *Id.* Given that strong federal interest, and because West Virginia's asserted interest directly conflicted with it, the court concluded that the state's interest was "more limited," *id.* at 356, and insufficient to support abstention, *see id.* (quoting *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 786 (4th Cir. 1996)).

Central to the court's decision was *Medigen of Kentucky, Inc. v. Public Service Commission*, 985 F.2d 164 (4th Cir. 1993), where the court held that materially similar West Virginia restrictions on interstate waste transportation were unconstitutional under the Dormant Commerce Clause. *Harper*, 396 F.3d at 350–51, 356–57. The court in *Harper* specifically noted that "West Virginia's interest, in light of our decision in *Medigen*, could not be sufficiently strong to require abstention." *Id.* at 357. The court further noted that, even though *Medigen* was not an abstention case, *Medigen* should have

25

made clear to the parties that the federal interest outweighs the state's interest in restricting market entry for *Younger* purposes. *Id.* ("We there made clear that state action 'restricting market entry,' *Medigen,* 985 F.2d at 167—the interest at stake here—was suspect. Although *Medigen* was not primarily an abstention case, its balancing of state interests similar to those raised here should have put the parties on notice of the *Younger* analysis that we have detailed above.").

Despite the *Harper* court's detailed discussion of the appellant's Dormant Commerce Clause claim, it did not require courts to decide the merits of the underlying claim before applying *Younger*. *See id.* at 355; *see also PDX*, 978 F.3d at 885 ("Even assuming [the appellant] is correct about the merits of its claims, we do not consider the merits 'when we inquire into the substantiality of the State's interest in its proceedings.' " (quoting *O'Neill v. City of Philadelphia*, 32 F.3d 785, 791–92 (3d Cir. 1994))). The court in fact stated that it did not "reach the merits of the underlying claim." *Harper*, 396 F.3d at 355. Rather, as just discussed, the court looked to the nature of the state's interest and to existing Commerce Clause precedent to determine whether the interest was important enough to justify abstention. *See id.* at 355–57.

We do the same here, and both considerations countenance abstention.

First, we address the nature of Pennsylvania's interest. Pennsylvania seeks to enforce generally applicable usury and consumer-credit laws against alleged lending activity involving Pennsylvania residents. J.A. 055; J.A. 653. The OSC alleges that TitleMax entered into 5,270 consumer loan agreements with Pennsylvania residents, took security interests in borrowers' vehicles, recorded liens with the Pennsylvania Department

26

of Transportation, and repossessed vehicles in Pennsylvania after default. J.A. 653. The OSC seeks a civil penalty of $10,000 per offense and restitution for aggrieved Pennsylvania residents. J.A. 055. The proceeding therefore implicates Pennsylvania's important interest in protecting its residents from usurious lending. *See Weissmann*, 24 F.4th at 241.

This interest does not, "by its very nature," impede interstate commerce. *Harper*, 396 F.3d at 355. Pennsylvania's usury laws do not reserve a market for Pennsylvania lenders or burden out-of-state lenders because they are out-of-state. *See Weissmann*, 24 F.4th at 240–41. They apply evenhandedly to in-state and out-of-state lenders transacting with Pennsylvania borrowers. *Id.* As *TitleMax of Delaware, Inc. v. Weissmann* explained, applying those laws to transactions with Pennsylvania borrowers places TitleMax in "no different position than an in-state lender." *Id.* at 240. And the OSC Proceeding does not seek to regulate commerce occurring wholly outside Pennsylvania. It concerns lending activity allegedly connected to Pennsylvania borrowers, Pennsylvania vehicle collateral, Pennsylvania liens, payments from Pennsylvania, and repossessions in Pennsylvania. J.A. 054–55; J.A. 653. That is different than in *Harper*, where West Virginia's interest was, in substance, "limiting interstate access" to a market. 396 F.3d at 355. Pennsylvania's asserted interest therefore falls within the traditional state interest in enforcing laws governing conduct connected to the state.

Second, no existing Commerce Clause precedent in this circuit precludes Pennsylvania's interest from being "sufficiently strong to require abstention." *Harper*, 396 F.3d at 357. And although we do not address the merits of TitleMax SC's Dormant Commerce Clause claim, the Third Circuit in *Weissman* did not suggest this state interest

27

was "suspect." *Id.* The Third Circuit in *Weissmann* considered Pennsylvania's application of the LIPL and CDCA to TitleMax's Pennsylvania conduct and rejected TitleMax's Dormant Commerce Clause challenge. *See* 24 F.4th at 239–41. In its *Pike* analysis, *Weissmann* recognized Pennsylvania's strong local interest in protecting its residents from usurious lending. *Id.* at 241. Neither *Weissman* nor any precedent from this circuit "ma[kes] clear" that Pennsylvania's asserted interest is the kind of market-excluding or protectionist interest that was "more limited" in *Harper*.[8] *Harper*, 396 F.3d at 356, 357.

Accordingly, the second *Middlesex* factor is satisfied.

### 3. Adequate Opportunity to Raise Constitutional Challenges

The third *Middlesex* factor asks whether the state proceeding affords the federal plaintiff an adequate opportunity to raise its federal claims. *Middlesex*, 457 U.S. at 432.

---

[8] *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010), does not alter that conclusion. In *Midwest*, the Seventh Circuit held that Indiana could not apply its consumer credit law to title loans made by an Illinois lender to Indiana residents because doing so directly regulated commercial activity occurring in Illinois. *Midwest*, 593 F.3d at 669. Midwest was an Illinois title lender that made loans to Indiana residents only at its Illinois offices. *Id.* at 662–63. A borrower would receive a cashier's check drawn on an Illinois bank, be handed over car keys in Illinois, and make payments to the lender in Illinois. *Id.* at 662–63, 668–69. But the loans had Indiana connections. *Id.* at 663. Midwest recorded its liens with Indiana motor vehicle authorities, repossessions occurred in Indiana, the repossessed vehicles were auctioned in Indiana, and Midwest advertised to Indiana residents. *Id.* at 663. The court nevertheless reasoned that those connections did not permit Indiana to regulate the loans because the contracts were "made and executed in Illinois," and Indiana's law interfered with "commercial activity that occurred in another state." *Id.* at 668–69.

At the same time, the Seventh Circuit acknowledged that Indiana had "a colorable interest in protecting its residents from the type of loan that Midwest purveys." *Id.* at 664. *Midwest* therefore does not change our *Younger* analysis. That case does not provide the precedential rejection of state interests that made abstention inappropriate in *Harper*.

28

Abstention is not "appropriate" where "state law clearly bars" a litigant from bringing constitutional claims, *Nivens v. Gilchrist*, 444 F.3d 237, 246 (4th Cir. 2006), or functionally bars meaningful consideration of a federal plaintiff's claims for relief, *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 335–39 (4th Cir. 2022). To provide an adequate opportunity to raise federal constitutional challenges, there must be a procedure for the relevant state adjudicator to consider and resolve those claims. *Middlesex*, 457 U.S. at 435. "It is sufficient under *Middlesex* . . . that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Dayton Christian Sch.*, 477 U.S. at 629.

TitleMax SC has not shown that Pennsylvania law "clearly bars" it from raising its federal claims in the OSC Proceeding. The Pennsylvania Rules of Administrative Practice and Procedure permit written motions "at any time," 1 PA. CODE § 35.178, and allow rulings on motions before a hearing, *id.* § 35.180(a). Pennsylvania law also provides judicial review after final agency action. 2 PA. CONS. STAT. § 702 ("Any person aggrieved by an adjudication of a Commonwealth agency who has direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure)."). Those procedures give TitleMax SC an adequate opportunity to present its constitutional objections in the OSC Proceeding and, if necessary, raise them on judicial review of a final agency adjudication.

The record confirms that TitleMax SC has availed itself, and continues to avail itself, of this process. The OSC advised TitleMax that it could challenge the OSC's allegations by filing an answer. J.A. 049–50. After an answer, the matter would proceed

29

through the administrative hearing process. *Id.* TitleMax filed an answer and moved to dismiss in the administrative proceeding, arguing that Pennsylvania lacked personal jurisdiction over TitleMax. J.A. 641–43; J.A. 714–15. The hearing examiner issued a proposed adjudication recommending denial of that motion. J.A. 641–42; J.A. 714–15. TitleMax then sought Commission review. J.A. 641–42. The Commission concluded that the matter was not properly before it for interlocutory review and stated that it would take no action at that time. J.A. 649. That interlocutory ruling meant that TitleMax SC could not obtain immediate Commission review before the administrative proceeding ran its course, but it did not prevent TitleMax SC from preserving its objections in the OSC Proceeding or from seeking judicial review after final agency action.

TitleMax SC responds that it has not received an adequate opportunity to raise constitutional challenges because Pennsylvania did not give it a final pre-hearing ruling on its personal jurisdiction defense. Appellant's Br. (ECF No. 21) at 49–53[9] (hereinafter "Opening Br."). In its view, personal jurisdiction is a threshold constitutional limit on the Department's authority, such that the defense should be finally resolved before TitleMax SC was required to participate in the OSC merits hearing. *Id.* at 50–51.

But that argument demands more than *Middlesex* requires, which, as discussed above, only asks whether the state proceeding allows a competent adjudicator to consider and resolve constitutional claims. *See Erie Ins. Exch.*, 105 F.4th at 151 ("What matters is that [the federal plaintiff] will have the chance to make its arguments to the hearing officer

---

[9] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

30

and later (if necessary) to the 'presumptively competent' Maryland state courts . . . . That is all *Younger* demands."). Even in federal courts, the denial of a motion to dismiss for lack of personal jurisdiction is ordinarily not immediately appealable as of right. *Rux v. Republic of Sudan*, 461 F.3d 461, 474–75 (4th Cir. 2006). Absent narrow exceptions, a party whose personal jurisdiction motion is denied must litigate to final judgment before seeking appellate review. *See* 28 U.S.C. §§ 1291, 1292(b). Requiring TitleMax SC to proceed to its merits hearing while preserving its jurisdictional objection therefore does not, by itself, make Pennsylvania's process inadequate.

Because TitleMax SC can raise its constitutional objections in the OSC Proceeding and, if necessary, on judicial review of a final agency adjudication, the third *Middlesex* factor is satisfied.

## C. Exceptions to *Younger*'s Duty to Abstain

Having determined that the OSC Proceeding falls within *Sprint*'s civil enforcement category and satisfies all three *Middlesex* factors, we next consider whether any of *Younger*'s narrow exceptions apply. There are "three exceptions to the court's duty to abstain: (1) 'bad faith or harassment' by state officials responsible for the prosecution; (2) a statute that is 'flagrantly and patently violative of express constitutional prohibitions; and (3) other 'extraordinary circumstances' or 'unusual situations.'" *Air Evac*, 37 F.4th at 96 (quoting *Younger*, 401 U.S. at 49–54). Additionally, *Younger* abstention is unwarranted when a federal plaintiff seeks relief that is "wholly prospective" and not "designed to annul the results of a state [proceeding]." *Wooley v. Maynard*, 430 U.S. 705, 711 (1977).

31

TitleMax SC invokes two exceptions.  It argues that the Department acted in bad faith, Opening Br. at 53–55, and that some of its requested relief is wholly prospective, Reply Br. (ECF No. 34) at 12–13.  Neither argument succeeds.

### 1.  Bad Faith

The bad faith exception only applies in cases involving "proven harassment" or proceedings brought "without hope" of success.  *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).

TitleMax SC argues that the Department's attempt at enforcing the LIPL and CDCA against TitleMax SC without allowing an adequate opportunity for raising constitutional claims constitutes bad faith.  TitleMax SC takes particular issue with its inability to obtain a final ruling on its personal jurisdiction defense before the OSC merits hearing.  But that argument identifies, at most, a dispute about interlocutory procedure and the timing of review.  It does not show harassment or a proceeding brought without hope of success.

The record shows that the hearing examiner and the Commission followed Pennsylvania's administrative process.  As discussed above, Pennsylvania's rules permit parties to file written motions "at any time," 1 PA. CODE § 35.178, and allow the presiding officer to issue rulings on motions, *id.* § 35.180.  They also permit interlocutory appeals from presiding-officer rulings only in limited circumstances, including when the presiding officer certifies that the ruling involves an important question of law requiring immediate review, or when the agency head allows interlocutory review.  *Id.* § 35.190(a), (c).  Consistent with that framework, the hearing examiner issued a proposed adjudication on TitleMax SC's motion to dismiss, TitleMax SC sought Commission review, and the

32

Commission concluded that the matter was not properly before it for interlocutory review and would take no action at that time.  J.A. 641–49.

Additionally, the Department's enforcement theory is not hopeless.  The Department began investigating TitleMax in 2017, when it issued an investigative subpoena seeking records concerning loans made to Pennsylvania consumers.  J.A. 025.  After litigation over that subpoena, the Third Circuit held that Pennsylvania could investigate and apply its usury laws to TitleMax's Pennsylvania-related lending activity without violating the Commerce Clause. *Weissmann*, 24 F.4th at 241.  The Commonwealth Court then enforced the subpoena, and TitleMax eventually complied.  J.A. 026–27; J.A. 088.

After that investigation, the Department issued the OSC.  The OSC alleged that TitleMax entered into 5,270 title-secured loan agreements with Pennsylvania residents for loans of $50,000 or less at interest rates exceeding the LIPL's 6% interest rate cap, with rates as high as 720%.  J.A. 054.  It further alleged that TitleMax engaged in loan activities in Pennsylvania.  J.A. 054–55.  Based on those allegations, the Department sought civil penalties and restitution and began administrative enforcement proceedings.  J.A. 055.

Those allegations and the investigative history defeat TitleMax SC's bad-faith theory.  The Department did not initiate the OSC Proceeding without prior notice.  It proceeded after an investigative subpoena, subpoena-related litigation, production of responsive documents, and a Third Circuit decision confirming that Pennsylvania had authority to investigate and apply its usury laws to TitleMax's conduct in Pennsylvania.

33

Given that history, TitleMax SC's disagreement with the Department's jurisdictional and substantive theories does not establish that the OSC Proceeding was brought in bad faith.

## 2. Wholly Prospective

Relief is wholly prospective only when it is "in no way designed to annul the results of a state [proceeding]." *Wooley*, 430 U.S. at 711. The exception therefore applies only when the requested federal relief would not interfere with any pending state proceeding. *See id.* Accordingly, requested relief is not wholly prospective if it would invalidate, halt, or circumvent an ongoing state adjudication. *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 166–67 (4th Cir. 2008). The exception therefore turns on practical interference, not on how the requested relief is labeled. *See TitleMax of Va.*, 2026 WL 49584, at *4. ("A federal-court order that prohibits the Department from regulating TitleMax in the future could interfere with the determination in the state proceeding of whether the Department may regulate TitleMax's identical past conduct—and not just by 'providing persuasive authority,' as TitleMax says."). That means even requests aimed at future state action are not wholly prospective if ruling on the future state action would affect or interfere with a pending state proceeding. *See id.*

This exception does not apply because TitleMax SC's requests related to future proceedings would interfere with the current, ongoing OSC Proceeding. The complaint seeks a declaration barring "any further action on the Order to Show Cause," an injunction prohibiting the Department from "enforcing the Order to Show Cause," and an injunction barring the Department from initiating any action "to enforce the June 2024 Subpoena, to enforce the Order to Show Cause, or to further regulate TitleMax of South Carolina's

34

business practices." J.A. 046. TitleMax SC's arguments related to that future regulation mirror its arguments related to the OSC Proceeding, which generally claim the Department may not enforce Pennsylvania usury laws against TitleMax SC for various constitutional reasons. J.A. 012–14; J.A. 037–41; J.A. 045–46. Accordingly, a federal ruling on the future regulation request would affect the ongoing OSC Proceeding because it would decide whether the Department may regulate the same business practices at issue there. The requested relief therefore is not wholly prospective.

*       *       *

Because the OSC Proceeding falls within *Sprint*'s civil-enforcement category, satisfies each *Middlesex* factor, and presents no exception permitting federal intervention, *Younger* abstention applies to TitleMax SC's OSC-related claims.

### III. Ripeness and the 2024 Subpoena

Where parties do not dispute relevant jurisdictional facts, we review a district court's dismissal based on ripeness de novo. *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (citing *Frank Krasner Enters. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)).

Ripeness and standing, two related justiciability doctrines that originate in Article III's case or controversy requirement, guide our analysis here. *Trump v. New York*, 592 U.S. 125, 131 (2020); *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (" 'Analyzing ripeness is similar to determining whether a party has standing.' " (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006))). Standing requires a plaintiff to show

35

" 'an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical.' " *Trump*, 592 U.S. at 131 (quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)).    Ripeness likewise prevents courts from deciding claims that depend on " 'contingent future events that may not occur as anticipated or indeed may not occur at all.' " *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

In the subpoena context, these doctrines require courts to distinguish between injuries caused by the subpoena itself and injuries that depend on later enforcement of the subpoena. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1121–24 (2026).  Pre-enforcement challenges to investigative subpoenas are generally premature when the subpoena is non-self-executing and the recipient alleges only future injuries that might arise if a court later enforces the subpoena. *See, e.g.*, *Wearly v. FTC*, 616 F.2d 662, 667 (3d Cir. 1980) (finding issuance of non-self-executing subpoena alone did not place subpoenaed party "on the horns of a dilemma" to either turn over the document or suffer civil or criminal penalties and that the subpoenaed person was "free to await enforcement proceedings, and at that time or thereafter, could have raised his objections"); *Google, Inc. v. Hood*, 822 F.3d 212, 223 (5th Cir. 2016) ("[W]e cannot agree with [the state] that an executive official's service of a non-self-executing subpoena creates an ongoing state judicial proceeding.").

A plaintiff may proceed before enforcement, however, if the subpoena itself causes an "actual or imminent" constitutional injury. *First Choice*, 146 S. Ct. at 1122.  The subpoena in *First Choice Women's Resources Centers, Inc. v. Davenport* demanded private donor information from a plaintiff, an advocacy organization. *See id.* at 1121.  The plaintiff

36

organization alleged that the issuance of the administrative subpoena had deterred donors from associating with it, causing the organization "to suffer an actual and ongoing injury" sufficient for standing purposes. *Id.* at 1122. The Supreme Court held that the plaintiff had "established a present injury" because a demand for private donor information can burden associational rights "when the [demand] is made and for as long as it remains outstanding." *Id*. at 1124. Important to the Court was that the allegations did not focus on future injuries that the plaintiff might face if a court enforced the subpoena. *Id.* at 1128.

The 2024 subpoena here is non-self-executing. Under Pennsylvania law, if a person disobeys a subpoena issued by the Department, "the Secretary of Banking may invoke the aid of the courts," and the court may then issue an order requiring compliance. 7 PA. CONS. STAT. § 6212. Only if the person fails to obey that court order may the court punish the failure as contempt. *Id.* The Department has not sought judicial enforcement of the 2024 subpoena. J.A. 744. TitleMax SC therefore faces no immediate sanction from the subpoena itself.

TitleMax SC also has not alleged that the subpoena itself causes "actual or imminent" constitutional injury. The 2024 subpoena seeks business records concerning loans, electronic payments, repossessions, and loan information for borrowers with Pennsylvania addresses. J.A. 060–64. TitleMax SC does not allege that the issuance of the subpoena itself changed its business practices or otherwise inflicted a present injury. TitleMax SC's asserted injury instead rests on the premise that the Department may not constitutionally enforce Pennsylvania's usury laws against it. Therefore, unlike the

37

subpoena in *First Choice*, the 2024 subpoena did not create a constitutional injury when "it [was] made" or "for as long as it remains outstanding." 146 S. Ct. at 1125.

Accordingly, TitleMax SC's claims challenging the 2024 subpoena were properly dismissed as unripe.

The dismissal of those claims, however, must be without prejudice. *See, e.g.*, *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 276 (4th Cir. 2013) (remanding a claim to the district court with instructions to dismiss without prejudice "because that claim is not ripe for judicial review"). The district court dismissed the 2024 subpoena claims for ripeness but entered judgment dismissing the complaint with prejudice. J.A. 744; J.A. 760. We therefore affirm the dismissal of the 2024 subpoena claims on ripeness grounds, vacate the judgment insofar as it dismissed those claims with prejudice, and remand with instructions to dismiss those claims without prejudice.

## IV. Conclusion

For these reasons, we affirm the dismissal of TitleMax SC's OSC-related claims under *Younger* abstention. We also affirm the dismissal of TitleMax SC's claims challenging the 2024 subpoena on ripeness grounds. Because those claims are not ripe, however, they must be dismissed without prejudice. We therefore vacate the judgment insofar as it dismissed the 2024 subpoena claims with prejudice and remand with instructions to dismiss those claims without prejudice.

*AFFIRMED IN PART, VACATED IN PART, AND*
*REMANDED WITH INSTRUCTIONS.*

38